UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

|  |  |  |
|---|---|---|
| CINDY LOU SUMNER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12-cv-27 |
| | ) | |
| v. | ) | Honorable Robert J. Jonker |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| _____ | ) | |

This is a social security action brought under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security denying plaintiff's claim for disability insurance benefits (DIB). On August 1, 2007, plaintiff filed her application for benefits alleging an August 2, 2006 onset of disability. (A.R. 110-12). Plaintiff's claim was denied on initial review. (A.R. 75-78). On April 19, 2010, she received a hearing before an administrative law judge (ALJ), at which he was represented by counsel. (A.R. 39-73). On June 18, 2010, the ALJ issued her decision finding that plaintiff was not disabled. (A.R. 19-31). On November 9, 2011, the Appeals Council denied review (A.R. 1-3), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision denying her claim for DIB benefits. Plaintiff asks the court to overturn the Commissioner's decision on the following grounds:

1.      The ALJ failed to properly evaluate medical opinion evidence and recognize plaintiff's fibromyalgia as a severe, disabling impairment within the meaning of the Social Security Act;

2.      The ALJ improperly relied on the testimony of the vocational expert whose testimony was in response to hypothetical questions that did not accurately portray plaintiff's impairments; and

3.      The ALJ failed to conduct a proper credibility analysis.

(Statement of Errors, Plf. Brief at 2, docket # 9). I recommend that the Commissioner's decision be affirmed.


## Standard of Review

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there

exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013) ("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from August 2, 2006, through the date of the ALJ's decision. (A.R. 21). Plaintiff had not engaged in substantial gainful activity on or after August 2, 2006. (A.R. 21). Plaintiff had the following severe impairments: degenerative changes of the cervical and lumbar spine, fibromyalgia, sleep apnea, mood disorder, and anxiety disorder. (A.R. 21). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments. (A.R. 21). The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 10 pounds frequently and 20 pounds occasionally; stand/walk for 6 hours total in an 8-hour workday; sit for 6 hours total in an 8-hour workday; never climb ladders; occasionally climb stairs; occasionally stoop/bend, kneel, crouch, and crawl; and frequently balance. This person must avoid extremes of cold and heat and must avoid wetness. This person cannot sustain work without the option to sit and/or stand at will. Further, this person has moderate limitation in the ability to maintain regular attendance and be punctual; maintain attention and concentration for extended periods of time; work with others without distracting them; performing at a consistent pace without an unreasonable number and length of rest periods; get along with the general public or with coworkers; and to respond appropriately to changes in the work setting.

(A.R. 23). The ALJ found that plaintiff's testimony regarding her subjective limitations was not fully credible. (A.R. 23-29). Plaintiff could not perform any past relevant work. (A.R. 29). Plaintiff was 48-years-old as of her alleged onset of disability and 52-years-old as of the ALJ's decision. At all times before October 11, 2007, plaintiff was classified as a younger individual. On and after October 11, 2007, plaintiff was classified as a person closely approaching advanced age. (A.R. 29). Plaintiff has at least a high-school education and is able to communicate in English. (A.R. 29). The ALJ found that the transferability of jobs skills was not material to a determination of disability. (A.R. 29). The ALJ then turned to the testimony of a vocational expert (VE). In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 3,000 jobs in the State of Michigan that the hypothetical person would be capable of performing. (A.R. 68-70). The ALJ found that this constituted a significant number of jobs. Using Rules 202.14 and 202.21 of the Medical-Vocational Guidelines as a framework, the ALJ found that plaintiff was not disabled. (A.R. 30-31).

**1.**

Plaintiff argues that the ALJ failed to evaluate medical opinion evidence and recognize plaintiff's fibromyalgia as a severe, disabling impairment within the meaning of the Social Security Act. (Plf. Brief at 10-14; Reply Brief at 2-5, docket # 13). In *Rogers v. Commissioner*, 486 F.3d 234 (6th Cir. 2007), the Sixth Circuit acknowledged the medical difficulty of making a diagnosis of a condition that "present[s] no objectively alarming signs." *Id.* at 243. "The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials. *Id.* at 244. "The principal symptoms [of fibromyalgia] are 'pain all over,' fatigue, disturbed sleep, stiffness, and -- the only symptom that discriminates between it and other diseases of a rheumatic character -- multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Huffaker v. Metropolitan Life Ins. Co.*, 271 F. App'x 493, 500 n.2 (6th Cir. 2008); *accord Titles II & XVI: Evaluation of Fibromyalgia*, SSR 12-2p (S.S.A. July 25, 2012) (reprinted at 2012 WL 3104869, at * 3) (effective July 25, 2012). *Lewis v. Colvin*, No. 13-369, 2013 WL 5952001, at * 5 (C.D. Cal. Nov. 6, 2013) ("Fibromyalgia's cause is unknown, there is no cure, and it is poorly understood within much of the medical community. The disease is diagnosed entirely on the patient's reports of pain and other symptoms.").

"[A] diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits . . . ."[1] *Vance v. Commissioner*, 260 F. App'x 801, 806 (6th Cir. 2008); *see Stankoski v.*

---

[1] Although the ALJ denied plaintiff's claim for DIB benefits years before SSR 12-2p went into effect, the guidance provided in the ruling is instructive. It states: "As with any adult claim for disability benefits, we use a 5-step sequential evaluation process to determine whether an adult with

*Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013) ("[A] diagnosis of fibromyalgia does not equate to a finding of disability or an entitlement to benefits."); *see also Infantado v. Astrue*, 263 F. App'x 469 (6th Cir. 2008); *Arnett v. Commissioner*, 76 F. App'x 713 (6th Cir. 2003). "'Some people may have a severe case of fibromyalgia as to be totally disabled from working ... but most do not and the question is whether [the claimant] is one of the minority.'" *Vance v. Commissioner*, 260 F. App'x at 806 (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)); *see Archer v. Colvin*, No. 1:13-cv-18, 2014 WL 457641, at * 5 (D. Me. Feb. 4, 2014) ("[N]ot every suggestion of fibromyalgia requires a conclusion that the condition is 'severe' or that it results in disability."); *Placke v. Colvin*, No. 4:12-cv-87, 2013 WL 5303746, at * 4 (S.D. Ind. Sept. 19, 2013) (same).

Plaintiff places great emphasis on the Sixth Circuit's decision in *Rogers v. Commissioner*, 486 F.3d 234 (6th Cir. 2007). She argues, "if one were to switch the names of the plaintiffs[,] the two cases would be virtually indistinguishable." (Plf. Brief at 10). This argument cannot withstand scrutiny.

In *Rogers*, the Sixth Circuit determined that although Debra Rogers had been diagnosed with fibromyalgia, "the ALJ's decision reflect[ed] some hesitancy in identifying this accepted medical condition as a severe impairment." 486 F.3d at 243. The ALJ did not appear to understand that the "process for diagnosing fibromyalgia involves testing for focal points and ruling out other conditions. The ALJ did not discuss this standard at all in his decision." *Id.* at 244. The ALJ gave little weight to the opinions expressed by plaintiff's treating physicians, including her long-term treating rheumatologist, Dr. Stein. *Id.* at 245. "Dr. Stein [was] a rheumatologist, and thus a specialist in the particular types of conditions Rogers claim[ed] to suffer from." *Id.* The

a [medically determinable impairment] of [fibromyalgia] is disabled." 2012 WL 3104869, at * 5.

"foundation for the opinions" of the non-examining physicians relied on by the ALJ "was the lack of objective findings." *Id.* at 245. "[I]n light of the unique evidentiary difficulties associated with fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant." *Id.* The Sixth Circuit reversed the ALJ's decision and remanded the matter for further administrative proceedings, because the ALJ did not provide good reasons for rejecting the opinions provided by Dr. Stein, plaintiff's treating rheumatologist. *Id.* at 245-46.

Here, by contrast, the ALJ did not hesitate to find that plaintiff's fibromyalgia was a severe impairment. (A.R. 12) She recognized the importance of trigger points in the process of diagnosing fibromyalgia. (A.R. 25). The ALJ did not base her decision on a faulty foundation nor require objective medical evidence in an inappropriate context.[2] The ALJ's opinion "did not run afoul of the principles regarding objective evidence of fibromyalgia that were expressed in *Rogers*. In *Rogers*, the court held that the ALJ erred in failing to find the claimant's fibromyalgia to be a severe impairment." *Torres v. Commissioner*, 490 F. App'x 748, 754 (6th Cir. 2012). The ALJ never rejected the opinions of a treating rheumatologist comparable to Dr. Stein. Here, the opinion of the treating rheumatologist supports the ALJ's finding that plaintiff was not disabled. For reasons examined in greater detail in the next section, the ALJ's opinion did not violate the treating physician rule. I find no error in the ALJ's consideration of the evidence regarding plaintiff's fibromyalgia and other impairments.

---

[2]The ALJ's consideration of the lack of objective evidence supporting plaintiff's purported limitations arising from medical conditions other than her fibromyalgia was entirely appropriate. *See Stankoski v. Astrue*, 2013 WL 4045974, at * 4; *see also Hudson v. Commissioner*, No. 12-13272, 2013 WL 4487452, at * 10 (E.D. Mich. Aug. 19, 2013) ("[T]he court does not believe that plaintiff has shown that the ALJ erred in relying – in part – on the fact that plaintiff's physical examinations included in the record have been routinely, albeit not universally, normal.").

**2.**

Plaintiff argues that the ALJ failed to give appropriate weight to the opinions of Bruce Galonsky, M.D. The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). A treating physician's opinion that a patient is disabled is not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician."). Likewise, "no special significance"[3] is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling, deference. *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011). "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician. Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'" *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)). A

---

[3]"We will not give any special significance to the source of an opinion on issues reserved to the Commissioner in paragraphs (d)(1) and (d)(2) of this section." 20 C.F.R. § 404.1527(d)(3).

treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, the opinion should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. § 404.1527(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative

bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482

F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

Plaintiff alleged an August 2, 2006 onset of disability. On September 5, 2006,

plaintiff reported to Dr. Galonsky, her primary care physician, that she was under more stress,

because her daughter-in-law and her family had moved in temporarily. (A.R. 242). Plaintiff

weighed 199.6 pounds and reported that her legs hurt and felt like jelly. Dr. Galonsky offered a

diagnosis of "Depression NOS and Pes Anserinus Bursitis/right." (A.R. 242). In October 2006,

plaintiff complained of back and hip pain. Dr. Galonsky gave her a prescription for Neurontin and

refilled a Vicodin prescription. (A.R. 240-41). X-rays taken of plaintiff's lumbosacral spine showed

"mild" degenerative changes at L5-S1 and were "[o]therwise unremarkable." (A.R. 245).

On January 5, 2007, plaintiff's chief complaints were mild headaches, nausea,

sweating and hot flashes. Plaintiff's husband stated that he thought that these symptoms related back

a few months to the date plaintiff's Duragesic dose had been increased. (A.R. 238). Dr. Galonsky

stated that he would slowly taper plaintiff's Duragesic and provide her with a prescription for Ativan

to help her get through the withdrawal period. He also increased plaintiff's dose of Prozac to 60 mg.

(A.R. 239). On January 11, 2007, plaintiff stated that she had not used a Duragesic patch in a

number of days but was experiencing nausea, shaking, tremors and fatigue. Dr. Galonsky gave

plaintiff a prescription for Phenergan to help address these withdrawal symptoms. (A.R. 236-37).

Plaintiff received treatment for about one year at Rheumatology P.C. as a participant

in a Johnson & Johnson (J&J) drug study. (A.R. 215). Plaintiff received treatment from a

rheumatologist, Robert Roschmann, M.D. On March 6, 2007, plaintiff stated that she had a long

history of back discomfort and occasional hip discomfort. She related that a MRI of her back and

hips had returned essentially normal results. She denied any tiredness or weakness. She did have intermittent fatigue and headaches, but no double or blurred vision. Plaintiff denied having depression or anxiety. She did have difficulty falling asleep. Her deep tendon reflexes were symmetrical and hyperactive bilaterally. She had "good motor and sensory proprioception." (A.R. 216). Her straight leg raising tests were negative. She had good muscle strength with flexion and extension of the upper extremities. She had no muscle atrophy. Her back had a good range of motion. She did have pain to palpation of the lumbosacral spine and the left sacroiliac area. (A.R. 216). Dr. Roschmann offered a working diagnosis of low back pain/degenerative disc disease of the lumbosacral spine, generalized osteoarthritis, history of osteopenia, and depression. Dr. Roschmann ordered additional x-rays and indicated that the patient would be seen again if she qualified to participate in the J&J study. (A.R. 217).

On March 20, 2007, plaintiff had her "baseline" visit at Rheumatology, P.C. She reported to a physician's assistant that she had experienced an increase in her low back pain and left lateral leg pain after she stopped taking her other medications. Plaintiff had no headaches or cephalic symptoms. On examination, the physician's assistant found that plaintiff had significant positive straight leg raising tests bilaterally. (A.R. 213). On March 21, 2008, Timothy Swartz, M.D., recorded plaintiff's complaints of flu-like symptoms. She appeared to be experiencing withdrawal symptoms. Dr. Swartz gave plaintiff a prescription for "OxyIR." (A.R. 343).

Plaintiff participated in the J&J study. (A.R. 214). She was monitored and was doing well on the 30 mg. dose of the drug being tested. (A.R. 207, 209). Her back pain was "markedly improved." She was not experiencing any side-effects from the medication. (A.R. 205). On May 15, 2007, plaintiff continued to do well on the study drug. She reported to Dr. Roschmann that she

"only ha[d] a little difficulty" when she did too many range of motion things and "a lot of repetitive things, but otherwise this dissipate[d] after she rest[ed]." (A.R. 201).

On May 17, 2007, plaintiff returned to Dr. Galonsky's office. She complained of hot flashes. She weighed 182 pounds. Galonsky discontinued plaintiff's Prozac and gave her a prescription for Effexor for both her depression and hot flashes. (A.R. 229-30).

In June 2007, plaintiff experienced an episode of bilateral trochanteric bursitis. (A.R. 200). On July 9, 2007, plaintiff reported to Dr. Galonsky that she had myalgias "[p]retty much everywhere." Dr. Galonsky stopped plaintiff's Oxycodone Hydrochloride prescription and gave her a new prescription for Premarin. (A.R. 227-28).

On July 10, 2007, Dr. Roschmann noted that plaintiff's bursitis had resolved. (A.R. 198). She reported that her back pain was reduced. (A.R. 197). In August 2007, plaintiff reported having more trouble with insomnia, but she did not believe it was related to the study drug. (A.R. 195).

On August 16, 2007, plaintiff reported to Dr. Galonsky that she was "gambling less," because she had less money coming in at the moment. (A.R. 225). She complained that she experienced bilateral knee and ankle pains in the morning. Dr. Galonsky offered a diagnosis of arthritis and hot flashes and gave plaintiff a prescription for Estradiol. (A.R. 225-26).

On September 4, 2007, plaintiff reported to Dr. Roschmann that she felt that the drug was losing its effectiveness after about 12 hours, because she began to feel more discomfort. (A.R. 193). In October 2007, plaintiff reported increased pain and stiffness with the change in seasons. Her reflexes were symmetrical bilaterally. She had a good range of motion in her shoulders, elbows, wrists, hip, knees, ankles and toes. Plaintiff displayed a decreased range of back motion with flexion

and extension. (A.R. 189). In November, plaintiff indicated that she was having problems with insomnia and that she tried to make herself sleepy by playing computer games and reading. (A.R. 187). Her physical examination was generally unremarkable. (A.R. 187). On December 26, 2007, Dr. Roschmann noted that plaintiff continued to have difficulty sleeping. She had "good muscle strength in flexion and extension of the upper and lower extremities." (A.R. 185).

On January 4, 2008, Dr. Galonsky offered a diagnosis of fibromyalgia and prescribed "hot tub, use daily." (A.R. 290). He also offered a diagnosis of insomnia and discussed the possibility of plaintiff's participating in a sleep study. (A.R. 291).

On January 22, 2008, plaintiff reported to Dr. Roschmann that she had stiffness and "a lot of achy pain" that she attributed to "weather change." (A.R. 183). Dr. Roschmann, described plaintiff as a "well-developed, pleasant female in no acute distress." (A.R. 183). Her deep tendon reflexes were symmetrical bilaterally. She had a good range of motion in her shoulders, elbows, hips, knees, ankles, and toes. She had "significant pain to palpation at multiple trigger points of the posterior back and neck, and extremities but no synovitis [was] noted in the upper or lower extremities." (A.R. 183). Dr. Roschmann offered a diagnosis of chronic back pain, osteoarthritis, and chronic trochanteric bursitis (resolved). (A.R. 184).

On February 4, 2008, plaintiff underwent a sleep study. It revealed "minor" sleep apnea. (A.R. 220).

On March 25, 2008, plaintiff received a mental status evaluation. (A.R. 255-59). Plaintiff arrived on time for her appointment and was accompanied by her husband. (A.R. 257). Plaintiff related that she had recently been diagnosed with fibromyalgia. She stated that she woke up with headaches almost every morning and had been experiencing memory problems for about a

year. (A.R. 255). Plaintiff described her medications and stated that sometimes she felt like a walking drugstore. She was not attending any form of counseling. She reported that she had graduated from high school and obtained a license in cosmetology. (A.R. 256). Plaintiff revealed that she would go off her medications for a couple of days when she was drinking alcohol: "I wouldn't take my meds and drink, that is not smart." (A.R. 256). Plaintiff had close friends and did "ok" in small groups, but had difficulty with large groups. She was oriented and presented her thoughts in a logical and organized manner. (A.R. 257). Psychologist George Starrett offered a diagnosis of a major depressive disorder, recurrent, moderate and an anxiety disorder NOS. (A.R. 259).

On April 7, 2008, S. Borter, M.D., reviewed plaintiff's records and completed a psychiatric review technique form. Dr. Borter offered his opinion that plaintiff's mental impairment did not meet the requirements of any listed impairment and resulted in only mild restriction in activities of daily living and mild difficulties in maintaining concentration, persistence, or pace. (A.R. 261-74).

On April 21, 2008, Shanthini Daniel, M.D., reviewed plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment. Dr. Daniel offered his opinion that plaintiff was capable of performing a limited range of light work. (A.R. 276-83).

On May 1, 2008, plaintiff reported to Dr. Galonsky that she had participated in the J&J study for about a year. She told him that the study drug "didn't work for her at all. Her pain was terrible and she felt like she was taking a fake pill." (A.R. 288). Dr. Galonsky offered a diagnosis of fibromyalgia and insomnia and continued plaintiff's medications. (A.R. 289). Plaintiff

stated that she was changing physicians because the drive to Dr. Galonsky's office in Battle Creek was "too far." (A.R. 289).

On July 9, 2008, plaintiff returned to Dr. Galonsky's office. She stated that she was out of pain medication for her leg and that "she ended up NOT changing to another doctor." (A.R. 286). Dr. Galonsky urged plaintiff to undertake a regimen of daily walking because it was the "only way to get past fibromyalgia." (A.R. 287).

On September 5, 2008, plaintiff saw Eric Lean, M.D., in Paw Paw. Plaintiff stated that she was leaving her doctor in Battle Creek. Plaintiff reported that she had some arthritis and fibromyalgia. She stated that she had problems with depression and anxiety and was taking Effexor. (A.R. 387). Dr. Lean noted that plaintiff would "go after disability secondary to her pain and fibromyalgia." (A.R. 386). Plaintiff was not in any acute distress. Dr. Lean noted that plaintiff was "tender" around the knee, upper shoulder near the neck, occipital region, and also had "trigger points." He offered a diagnosis of fibromyalgia, depression, and gastroesophageal reflux disease, chronic back pain, and menopausal syndrome. (A.R. 386-87).

On November 20, 2008, plaintiff informed Pamela Nelson, M.D., that she was "[f]ighting for disability for Fibromyalgia." (A.R. 371). Plaintiff was oriented in all three spheres, and her mood and affect were appropriate. She reported that for about a year she had experienced headaches when she exercised. She stated that Excedrin helped with pain relief. She reported financial stress related to her husband's loss of his job. (A.R. 371). On December 12, 2008, plaintiff complained of anxiety and depression. Dr. Nelson gave her a prescription for Prozac. (A.R. 361-63).

In February 2009, plaintiff asked Dr. Nelson for a referral to a rheumatologist, because "she [was] trying to get disability and her lawyer [had] advised her that if she had a statement from a rheumatologist that it would help her case." (A.R. 359). On March 3, 2009, Dr. Nelson conducted a brief counseling session with plaintiff. (A.R. 358). Dr. Nelson advised plaintiff to ask her attorney if "an evaluation with a PM&R [physical medicine and rehabilitation] specialist would suffice." (A.R. 357).

Dr. Nelson referred plaintiff to Thomas Dunne, M.D., for a neurological consultation. (A.R. 391). On November 3, 2009, plaintiff informed Dr. Dunne that she was applying for disability "on account of her back problems." (A.R. 391). She related that she had never had back surgery. She "ha[d] not had any studies done for some five years now." (A.R. 391). On examination, Dr. Dunne found that plaintiff's arms were "fine" and that she had "no pain in the neck." She had normal speech and mentation. She had good strength in her upper and lower extremities. (A.R. 392). On December 1, 2009, Dr. Dunne noted that the MRI of plaintiff's lumbosacral spine was negative. "The EMG did not show any evidence of radiculopathy, and x-rays were likewise bland." (A.R. 390). He described plaintiff as being "bright and alert." She walked with a slightly antalgic gait and she was able to squat and rise with little difficulty. Her straight leg raising tests were negative. She did have "a little tenderness to palpation over the right hip." (A.R. 390). On December 22, 2009, Dunne, a neurologist and psychiatrist, gave Dr. Nelson the following summary of his findings:

> Because of her complaints of persistent pain, I did a rather extensive workup. The results were as follows: The only positive finding was that of her bilateral hips, of which he did x-rays and MRIs. She has a small amount of fluid in her left hip joint on the MRI and some mild arthritis changes in her bilateral hips. Her bone scan was normal. Her spine screen of the cervical region showed moderate canal stenosis and mild cord impingement from

degenerative changes and retrolisthesis. Thoracic level was normal, as was the lumbar spine except for mild scoliosis. Her duplex examination of her lower extremities showed only mildly decreased perfusion of the lower left extremity at the infrapopliteal level. X-rays of the lumbar spine mirrored the changes seen in the MRI, namely very mild scoliosis. EMG was within normal limits.

I would recommend only general measures for the patient at the present time. Physical therapy might not be a bad idea, and of course weight loss. What to do about the hips I will leave up to you.

The patient's examination is unchanged. Still walks with a slightly antalgic gait and, as I mentioned, is a little overweight.

Of interest is the fact that the patient herself volunteered a potential diagnosis for her problems, namely her fibromyalgia. This may not be very far off the mark.

(A.R. 388; *see* A.R. 393-408).

On April 19, 2010, plaintiff received her hearing before the ALJ. Two days after the hearing, Dr. Galonsky completed a RFC questionnaire labeled as a "Medical Provider's Assessment of Patient's Ability to do Physical Work-related Activities." (A.R. 410-17).

Plaintiff argues that the ALJ should have given greater weight to Dr. Galonsky's opinions that she was "unable to work" and that her RFC was limited to an extremely limited range of sedentary work.[4] (Plf. Brief at 10-14). The ALJ addressed Dr. Galonsky's opinions on these issues reserved to the Commissioner at length:

When followed by her primary care physician, Bruce Galonsky, M.D. on July 9, 2008, the claimant was complaining of leg pain. The claimant stated that she was out of pain medication for her leg. She said that her Tramadol helped the pain and the Flexeril helped her sleep, but she cannot take Flexeril during the day because she gets leg cramps. The examination was benign except for tender points of fibromyalgia. The assessment was

---

[4]Plaintiff lists other physicians (Plf. Brief at 12), but presents no developed argument that any specific medical opinion rendered by these individuals failed to receive appropriate weight. Perfunctory arguments are deemed waived. *See Clemente v. Vaslo*, 679 F.3d 482, 497 (6th Cir. 2012); *see also Carolina Cas. Ins. Co. v. Cannal Ins. Co.*, No. 13-610, 2014 WL 114667, at * 5 (6th Cir. Jan. 14, 2014).

fibromyalgia with multiple tender points. Her medications were continued with the exception of Oxycodone and Flexeril (no longer needed). Added to her medication list was a higher dose of Tramadol for pain and Trazadone for sleep. The claimant was urged to increase her exercise by walking, as this is the only way to get past fibromyalgia (exhibit 9F/1-2).

On March 2, 2009, the claimant was seen at the Bronson Lakeview Hospital to discuss a referral to a rheumatologist. She said that her attorney wanted a diagnosis from a rheumatologist as it would hold more water than one from a generalist. The claimant stated that she had not been exercising because exercise causes her to have headaches. She stated that she has not been to a counselor; had stopped taking some medications due to expense; had not been to a pain management clinic because insurance would not pay; and had not been to a physical medicine and rehabilitation (PM&R) specialist. After examination with rather routine findings, it was suggested to the claimant [by Dr. Nelson] that she consider being seen by a PM&R specialist, as a rheumatologist would likely refer her back to her primary care physician after a diagnosis of fibromyalgia and she already has such a diagnosis. She was also advised to exercise and that she should check out stretching and [Pilates] classes. She said that insurance would not pay for physical therapy so she will search out video tapes (exhibit 10F/2-3).

The claimant underwent extensive work-up with Thomas C. Dunn[e], M.D., Board Certified neurologist and psychiatrist. In his final follow-up report dated December 22, 2009, he records that the only positive finding was that of her bilateral hips, of which he did x-rays and MRIs. She has a small amount of fluid in her left hip joint on the MRI and some mild arthritis changes in her bilateral hips. Her bone scan was normal. Her spine screen in the cervical region showed moderate canal stenosis and mild cord impingement from degenerative changes and retrolisthesis. Thoracic level was normal, as was the lumbar spine except for mild scoliosis. The duplex examination of her lower extremities showed only mildly decreased perfusion of the left lower extremity at the infra-popliteal level and was otherwise normal. X-rays of the lumbar spine mirrored the changes seen in the MRI, namely very mild scoliosis. EMG was within normal limits. Dr. Dunn[e] recommended only general measures for the claimant at the present time. He opined that physical therapy might not be a bad idea, and of course weight loss. The claimant's examination was unchanged from her initial evaluation. She still walks with a slightly antalgic gait and she is a little overweight. (exhibit 11F/1).

At the request of the claimant's attorney, Dr. Galonsky completed and submitted an assessment of the claimant's residual functional capacity on April 21, 2010 (exhibit 12F/2-5). He opined that the claimant was capable of work activities significantly less than sedentary exertion. He recorded that he did not feel that the claimant was capable of obtaining and keeping employment in a competitive work environment (exhibit 12F/5).

* * *

The ALJ is fully aware that Dr. Galonsky gave an opinion that the claimant was unable to work or similar expressions (exhibit 12F/2-5). This opinion is not well supported by objective evidence, but has nonetheless been considered in light of all the evidence of record -- as well as the provisions of Social Security Regulations Nos. 4 and 16, Subparts P and I, Sections 404.1527 and 416.927 which provide as follows: We are responsible for determining whether you are disabled or blind. Therefore, a statement by your physician that you are "disabled" or "blind" or "unable to work" does not mean that we will determine that you are disabled or blind. We have to review the medical findings and other evidence that support a physician's statement that you are "disabled" or "blind." Dr. Galonsky opined that the claimant was capable of work activities significantly less than sedentary exertion. He recorded that he did not feel the claimant was capable of obtaining and keeping employment in a competitive work environment. This opinion is not only inconsistent with his own office visit notes but is inconsistent with the findings of claimant's rheumatologist and neurologist.

(A.R. 25-28).

The ALJ gave good reasons for the weight she gave to the opinions expressed by Dr. Galonsky. The doctor's opinions on issues reserved to the Commissioner were not entitled to any special significance. 20 C.F.R. § 404.1527(d)(3). The level of functional restriction he suggested was far greater than the limitations indicated in his progress notes. Rheumatology is the relevant specialty for evaluating fibromyalgia. *See Rogers*, 486 F.3d 245; *see also Solomon v. Colvin*, No. 13-5121, 2014 WL 741548, at * 5 (C.D. Cal. Feb. 25, 2014). The ALJ found that the opinions expressed by plaintiff's treating rheumatologist, Dr. Roschmann, and Dr. Dunne, a Board Certified neurologist and psychiatrist, were more persuasive than the opinions expressed by her family physician. (A.R. 28). It was entirely appropriate for the ALJ to give greater weight to the opinions of physicians with specialized expertise. 20 C.F.R. § 404.1527(c)(5). I find no violation of the treating physician rule.

**3.**

Plaintiff argues that the ALJ "failed to conduct a proper credibility analysis of claimant or claimant's witnesses[5] in clear violation of SSR 96-7p and *Rogers v. Comm'r of Social Security*, 486 F.3rd 234 (6th Cir. 2007)." (Plf. Brief at 15). Credibility determinations are peculiarly within the province of the ALJ. *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The court does not make its own credibility determinations. *See Walters v. Commissioner*, 127 F.3d at 528. The court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed . . . ." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard. This is a "highly deferential standard of review." *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton v. Halter*, 246 F.3d at 773; *accord White v. Commissioner*, 572 F.3d

---

[5]Plaintiff's brief does not contain any developed argument regarding other witnesses. The issue is deemed waived. *See Clemente v. Vaslo*, 679 F.3d at 497. Assuming the issue is not waived, it is meritless. The only person plaintiff could possibly be alluding to is her husband. Mr. Sumner's testimony consisted of a "yes," confirming that he had been sworn, and the following response to the ALJ's question inquiring if he had anything to add: "I think you pretty well covered it." (A.R. 66).

272, 287 (6th Cir. 2009); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993).

Plaintiff avers that the ALJ's analysis of her credibility was deficient because it does not permit meaningful appellate review and that it "was improper for the ALJ in this case to discredit Plaintiff's credibility based on the performance of some minimal daily functions that are not comparable to typical work activities." (Plf. Brief at 15-17; Reply Brief at 2-3). Plaintiff also argues that the ALJ focused too heavily on the lack of objective evidence supporting the functional limitations. (Reply Brief at 5). I find that plaintiff's arguments do not provide a basis for disturbing the Commissioner's decision.

The ALJ gave a more than adequate explanation why she found that plaintiff's extensive daily activities undermined her claims of disabling functional limitations. (A.R. 23-29). It was entirely appropriate for the ALJ to take plaintiff's daily activities into account in making her credibility determination. *See Cruse v. Commissioner*, 502 F.3d 532, 542 (6th Cir. 2007); *Blacha v. Secretary of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990); *see also Cocke v. Colvin*, No. 5:13-cv-114, 2014 WL 798158, at * 2 (W.D. Ky. Feb. 27, 2014) ("In fibromyalgia cases, due to an inherent lack of objective evidence, the ALJ typically focuses on the claimant's activities of daily living or lack thereof, whether the individual's records show that the symptoms have progressively worsened, improved, or remained stable, and subtle factors that are not apparent on the face of the record such as demeanor."). Plaintiff's ability to work on a computer, maintain a driver's licence and drive, prepare meals, interact with the general public at restaurants, perform household chores, provide care for her pets, pay bills and manage checking and savings accounts were important and relevant considerations. They cannot be disregarded through the mere expedient

of labeling them as "not comparable to typical work activities." (Plf. Brief at 17). The ALJ is responsible for making credibility determinations, not the court. I find that the ALJ's factual finding regarding plaintiff's credibility is supported by more than substantial evidence.

## 4.

Plaintiff argues that the ALJ relied on the testimony of the vocational expert, who responded to hypothetical questions that did not accurately portray plaintiff's impairments. (Plf. Brief at 14-15). Plaintiff's challenge to the adequacy of the hypothetical question posed to the VE is a mere reformulation of her unsuccessful challenge to the ALJ's credibility determination. The ALJ found that plaintiff's subjective complaints were not fully credible. It is well settled that a hypothetical question to a VE need not include unsubstantiated limitations. *See Carrelli v. Commissioner*, 390 F. App'x 429, 438 (6th Cir. 2010); *Gant v. Commissioner*, 372 F. App'x 582, 585 (6th Cir. 2010) ("[I]n formulating a hypothetical question, an ALJ is only required to incorporate those limitations which [s]he has deemed credible."). The ALJ's hypothetical question included all the limitations she found to be credible.

## Recommended Disposition

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.


Dated:  March 6, 2014                    /s/  Joseph G. Scoville_____
                                                    United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).